UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

LAWRENCE MARANO,                                      :

                   Plaintiff,                          :

        - against -                                   :

THE METROPOLITAN MUSEUM OF ART,          :

             Defendant.                        :

------------------------------------------------------------ x

Case No. 19-cv-08606 (VEC)

Oral Argument Requested

**DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO
PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE REQUIRING
PLAINTIFF TO DEMONSTRATE WHY THIS ACTION SHOULD NOT
BE DISMISSED UNDER THE FAIR USE EXCEPTION TO THE COPYRIGHT ACT**

Linda Steinman
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Phone:  (212) 603-6409
Fax:  (212) 489-8340
lindasteinman@dwt.com

*Attorney for Defendant
The Metropolitan Museum of Art*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 4

A.      THE MUSEUM IS A RENOWNED CULTURAL INSTITUTION SERVING
THE PUBLIC GOOD ................................................................................... 4

      1.      The "Play It Loud: Instruments of Rock & Roll" Exhibition Presented
Musical Instruments as Art ........................................................................ 5

      2.      The "Frankenstein" Guitar and Its Creator, Eddie Van Halen.............................. 6

ARGUMENT ...................................................................................................... 8

I.      FAIR USE WARRANTS DISMISSAL OF THIS ACTION ........................................... 8

II.      SINCE ALL OF THE RELEVANT FACTORS WEIGH IN FAVOR OF FAIR
USE, THIS COURT SHOULD DISMISS THE COMPLAINT ....................................... 8

      A.      The Purpose and Character of The Museum's Use of the Photo Was
Unquestionably Noncommercial and Transformative ........................................... 10

            1.      The Museum's Use of the Photo was Noncommercial........................... 10

            2.      The Museum's Use was Transformative as to Purpose and Context........ 12

            3.      Plaintiff Inexplicably Relies Heavily on "News Reporting" Cases
Involving Media Companies.................................................................. 18

      B.      The Nature of the Photo Supports a Fair Use Determination .............................. 19

      C.      The Amount and Substantiality of The Museum's Use Weighs in Favor of
Fair Use ................................................................................................. 20

      D.      The Museum's Use Has No Impact on the Potential Market For or Value
of the Subject Photograph ......................................................................... 21

CONCLUSION.................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adjmi v. DLT Entm't Ltd.*,
    97 F. Supp. 3d 512 (S.D.N.Y. 2015) ........................................................................8

*Arica Inst., Inc. v. Palmer*,
    970 F.2d 1067 (2d Cir. 1992) ................................................................................20

*Arrow Prods., LTD. v. Weinstein Co.*,
    44 F. Supp. 3d 359 (S.D.N.Y. 2014), *aff'd*, 729 F. App'x 131 (2d Cir. 2018) ........................8

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ..................................................................18

*Authors Guild v. Google Inc.*,
    804 F.3d 202 (2d Cir. 2015) ....................................................................... *passim*

*Bill Graham Archives v. Dorling Kindersley Ltd*,
    448 F.3d 605 (2d Cir. 2006) ....................................................................... *passim*

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) ....................................................................... *passim*

*BWP Media United States, Inc. v. Gossip Cop Media, Inc.*,
    196 F. Supp. 3d 395 (S.D.N.Y. 2016) ..................................................................18

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014) ..............................................................10, 12, 19

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569, 114 S. Ct. 1164 (1994) ................................................9, 10, 20, 24

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013) ..............................................................12, 20, 22, 24

*Castle Rock Entm't v. Carol Publ'g Group*,
    150 F.3d 132 (2d Cir. 1998) ................................................................................22

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ..................................................................................4

*Clark v. Transportation Alternatives, Inc.*,
    No. 18 Civ. 9985 (VM), 2019 WL 1448448 (S.D.N.Y. Mar. 18, 2019) ..................8

*Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001)......................................................................................10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991).................................................................................................9

*Fitzgerald v. CBS Broad., Inc.*,
  491 F. Supp. 2d 177 (D. Mass. 2007) .....................................................................21

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)...............................................................................................19

*Katz v. Chevaldina*,
  No. 12-22211-CIV., 2014 WL 2815496 (S.D. Fla. June 17, 2014), *aff'd, Katz
  v. Google Inc.*, 802 F.3d 1178 (11th Cir. 2015)......................................................19

*Konangataa v. Am. Broadcasting Companies, Inc.*,
  2017 WL 2684067 (S.D.N.Y. June 21, 2017) .........................................................18

*Lombardo v. Dr. Seuss Enters., L.P.*,
  279 F. Supp. 3d 497 (S.D.N.Y. 2017).......................................................................8

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
  904 F.2d 152 (2d Cir. 1990)....................................................................................12

*North Jersey Media Grp. Inc. v. Pirro*,
  74 F. Supp. 3d 605 (S.D.N.Y. 2015)..................................................................19, 20

*Nunez v. Caribbean Int'l News Corp.*,
  235 F.3d 18 (1st Cir. 2000).................................................................................18, 21

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004)....................................................................................10

*Otto v. Hearst Communications*,
  345 F. Supp. 3d 412 (S.D.N.Y. 2018)............................................................. *passim*

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F. 3d 1146 (9th Cir. 2007) ......................................................................13, 20, 21

*Philpot v. Media Research Center Inc.*,
  279 F. Supp. 3d 708 (E.D. Va. 2018) ......................................................................19

*Psihoyos v. Nat'l Exam'r*,
  No. 97 Civ. 7924 (JSM), 1998 WL 336655 (S.D.N.Y. June 22, 1998)....................18

*Red Label Music Publishing v. Chila Productions*,
  388 F. Supp. 3d 975 (N.D. Ill. 2019) ......................................................................14

*Sedgwick Claims Mgmt. Servs., Inc. v. Delsman*,
    No. C 09-1468 SBA, 2009 WL 2157573 (N.D. Cal. July 17, 2009), *aff'd*, 422
    F. App'x 651 (9th Cir. 2011) ....................................................................................8

*SOFA Entertainment v. Dodger Productions*,
    709 F.3d 1273 (9th Cir. 2013) ...............................................................................14

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984). Pl. Memo .............................................................................24

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014).......................................................................... *passim*

*Warren Publishing Co. v Spurlock*,
    645 F. Supp. 2d 402 (E.D. Pa. 2009) .....................................................................14

**Federal Statutes**

17 U.S.C. § 107 *et seq*..................................................................................... *passim*

17 U.S.C. § 505 .........................................................................................................25

**Constitutional Provisions**

U.S. Const. Article I, § 8, cl. 8.................................................................................10

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4]
    (2005)......................................................................................................................22

Charter of The Metropolitan Museum of Art, State of New York, Laws of 1870,
    Chapter 197, passed April 13, 1870, and amended L.1898, ch. 34; L. 1908, ch.
    219.............................................................................................................................5

*Code of Best Practices in Fair Use for the Visual Arts*, located at
    https://www.collegeart.org/programs/caa-fair-use/best-practices ........................1, 3

Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105 (1990) .....................9, 25

In the Court's *sua sponte* Order to Show Cause dated September 18, 2019 ("OSC") [Dkt. No. 6], the Court required Plaintiff Lawrence Marano ("Plaintiff") to show cause why The Metropolitan Museum of Art's use of Plaintiff's photo (the "Photo") as alleged in the complaint did not constitute fair use under the Copyright Act.  The Metropolitan Museum of Art (the "Museum") respectfully submits this memorandum of law in response to Plaintiff's submission[1] and requests that the complaint be dismissed with prejudice under the fair use exception set forth in 17 U.S.C. § 107.

## PRELIMINARY STATEMENT

As a nonprofit institution dedicated to the arts, the Museum has the utmost respect for artists, including photographers, and their need to protect their rights.  As the College Art Association has recognized, however, in its *Code of Best Practices in Fair Use for the Visual Arts*, "The right to make fair use of copyrighted materials is a key tool for the visual arts community" – one that permits artists themselves, as well as museums, scholars, and teachers to educate, expand knowledge, and engage with contemporary culture.[2]

Plaintiff's sole allegation in the Complaint is that the Museum infringed the copyright in his Photo depicting Eddie Van Halen ("Van Halen") playing his "Frankenstein" guitar by including the Photo in the Museum's online exhibition catalogue ("Online Exhibition Catalogue"), within its website, www.metmuseum.org (the "Website"), in connection with the "Play It Loud: Instruments of Rock & Roll" exhibition (the "Exhibition").  The Exhibition

---

[1] Plaintiff's response to the OSC consists solely of a memorandum of law dated October 9, 2019 ("Plaintiff's Memo") [Dkt. No. 9].  He did not submit any affidavit or other evidence.
[2] See https://www.collegeart.org/programs/caa-fair-use/best-practices (hereinafter "CAA Code") at 5-6.

prominently featured Van Halen's "Frankenstein" guitar.  Compl. Para. 13 and Ex. B.  But this use of the Photo is a clear fair use under well-established case law. [3]

The Museum's use of the Photo in the Online Exhibition Catalogue is found deep within the Online Exhibition Catalogue, reached only after the virtual visitor visits the sub-page for the Exhibition, selects "Exhibition Objects" and clicks on the sub-page for the "Frankenstein" guitar. The use is a nonprofit educational use, thus strongly favoring a finding of fair use with respect to the first fair use factor (the purpose and character of the use).  The Museum is a registered Section 501(c)(3) nonprofit organization and a New York City Designated Cultural Institution – not a commercial media organization – and the Online Exhibition Catalogue is free, and thus the Museum's use of the Photo did not generate revenue.

The Museum's use of the Photo also is "transformative" – the other component of the first fair use factor – and falls comfortably within the illustrative fair uses set forth in the preamble to §107 of the Copyright Act, which include uses for purposes such as comment, teaching, scholarship and research.  The Museum did not use the Photo for its original aesthetic purpose – which Plaintiff identifies as "for the purpose of showing what Van Halen looks like in performance (Pl. Mem. at 5) – but rather to illustrate the "Frankenstein" guitar, a work of art, in use.  The Photo was displayed to demonstrate that Van Halen had created a new musical sound by literally forging his own instrument, as the commentary in the Online Exhibition Catalogue suggests, and to inform the public that this ground-breaking guitar was included in the

---

[3] Plaintiff's Memo asserts for the first time that the Museum used the Photo "in its art gallery," as well as on its Website.  Pl. Mem. at 1, 5, 7.  However, this use is not alleged in the Complaint and thus is not part of the case.  *See* Dkt. No. 1.  The Museum did use a small version of the Photo on an informational placard with substantial text next to the "Frankenstein" guitar at the Exhibition and also included a passing (less than 1 second) reference at :25, at 72 dpi, on the "Play It Loud: Instruments of Rock and Roll" Exhibition preview found only on the "Featured Media" section of the Online Exhibition Catalogue. Steinman Decl., para. 10.  While these uses are outside the scope of the Complaint, both are classic fair uses as noncommercial transformative uses for similar reasons as set forth herein.

Exhibition – a use consistent with the Museum's core mission.  In short, as in *Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605, 610 (2d Cir. 2006), the Museum used the Photo as an "historical artifact" documenting the Exhibition object being played by Van Halen – a type of use deemed highly transformative by the Second Circuit.  Finally, contrary to Plaintiff's brief, the Museum's use is more than adequate to qualify as fair use since a defendant "is not required to discuss the artistic merits of the images to satisfy this first factor of the fair use analysis." *Id.* at 611.

The College Art Association has specifically identified such online exhibition catalogues and similar museum websites associated with exhibits as a likely fair use, and well explains their broader purpose:

> Physical exhibitions may be complemented by virtual counterparts or online enhancements so that remote visitors can virtually "walk through" the galleries, appreciate the curatorial narrative, and if desired, focus their attention on particular works.  Similarly, online documentation of collections (including collection catalogues and databases of images and metadata) can help to place individual artworks in a larger institutional or cultural context and provides some of the benefits of a physical visit to the museum, as well as providing access to material not currently on display.  Such documentation also may prepare the members of the public to interact more fully with art when they visit the museum in person.

CAA Code at 12.

Further, the fourth factor of the fair use analysis, which focuses on market harm, favors the Museum since a copyright plaintiff is not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense.  *See Bill Graham Archives*, 448 F.3d at 614-15 ("Copyright owners may not preempt exploitation of transformative markets").  The Museum's use of Marano's 30 plus year old Photo in its Online Exhibition Catalogue is wholly different from the "news reporting" cases relied upon by Plaintiff, where courts often found market harm from the use of a photo depicting a newsworthy event because "Publishing the [p]hotograph without

3

permission essentially destroys the primary market for its use." *Otto v. Hearst Communications*, 345 F. Supp. 3d 412, 432 (S.D.N.Y. 2018).

In sum, as the Second Circuit repeatedly has held, courts assessing a fair use defense "must engage in 'an open-ended and context-sensitive inquiry.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014), quoting *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).  Plaintiff wholly ignores the context here, instead relying overwhelmingly on inapposite caselaw concerning uses of photos by commercial media organizations in news stories or celebrity magazines.  For all the reasons set forth below, a context-sensitive analysis demonstrates that the Museum's use constitutes a fair use, and Plaintiff's complaint should be dismissed with prejudice.[4]

## FACTUAL BACKGROUND

The following factual background is derived from the Complaint and the Museum's Website.[5]

### A.     The Museum is a Renowned Cultural Institution Serving the Public Good

The Museum is the largest art museum in the United States and one of the foremost cultural institutions in the world.  It displays over 5,000 years of art to millions of visitors every year. Visitors to the Museum are able to study tens of thousands of rare objects on display.

---

[4] Given the unusual procedural posture of the Court's order to show cause, the Museum respectfully reserves the right, in the event the Court does not dismiss the action at this stage, to file a motion to dismiss the complaint under Rule 12(b)(6) or a motion on the pleadings under Rule 12(c), including on additional defenses beyond fair use, including potential problems with the Photo's copyright registration.

[5] The Court may consider the Website's contents since Plaintiff specifically referenced the Website in his Complaint ("Compl.") at paras. 6 and 10, and Ex. B.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."). Relevant excerpts from the Website and the Online Exhibition Catalogue are submitted herewith as exhibits to the accompanying declaration of Linda Steinman dated October 23, 2019 ("Steinman Decl.").  *See also* https://www.metmuseum.org/exhibitions/listings/2019/play-it-loud.

Steinman Decl., Ex. A.  Extending its cultural and academic reach, the Museum operates the Website, which expands its range by welcoming without charge millions of virtual visitors every year.  The Website includes countless images, videos, and textual information detailing the Museum's collections, educational programs, publications, events, special exhibitions and archives in order to better inform the public and enhance the overall visitor experience.

In 1870, the New York State Legislature authorized the initial creation and incorporation of the Museum.[6]  The Museum's early charter directed that it "be located in the City of New York, for the purpose of establishing and maintaining in said city a Museum and library of art, of encouraging and developing the study of fine arts, and the application of arts to manufacture and practical life, of advancing the general knowledge of kindred subjects, and, to that end, of furnishing popular instruction."  Steinman Decl., Ex. A.  More recently, in 2015, the Museum adopted the following mission statement: "The Metropolitan Museum of Art collects, studies, conserves, and presents significant works of art across all times and cultures in order to connect people to creativity, knowledge, and ideas."  *Id*.  In short, since its founding, the Museum's mission has been to serve the public good by fostering scholarship and by presenting permanent galleries, exhibits and events that bring the fine arts to life.

### 1. The "Play It Loud: Instruments of Rock & Roll" Exhibition Presented Musical Instruments as Art

The "Play It Loud: Instruments of Rock & Roll" Exhibition presented many of the world's most celebrated musical instruments from the Rock & Roll era, alongside concert posters, stage costumes, and other historical artifacts.  Steinman Decl., Ex. B.  The rock artists themselves loaned many of the iconic instruments.  In both the Exhibition's galleries and the

---

[6] Charter of The Metropolitan Museum of Art, State of New York, Laws of 1870, Chapter 197, passed April 13, 1870, and amended L.1898, ch. 34; L. 1908, ch. 219.

Online Exhibition Catalogue, the Museum provided interpretive text, photographs, and multimedia presentations showing many of the instruments on display being played by musicians such as Chuck Berry, The Beatles, Joan Jett, and The Rolling Stones. *Id.*

> **2.     The "Frankenstein" Guitar and Its Creator, Eddie Van Halen**

At issue in this case is the Museum's use of the Photo, purportedly taken by Plaintiff over 30 years ago, that shows Van Halen on a concert stage playing the "Frankenstein" guitar. *See* Compl. para. 7 and Ex. A.  Van Halen designed and assembled the guitar himself to create his specific sound, and the Exhibition prominently displayed the instrument.  The Museum's use of the Photo was found among the other 184 Exhibition objects, on a sub-webpage deep within the Online Exhibition Catalogue, accessible only after a visitor to the Website clicked through at least three other sub-pages, in the context of a significant amount of other interpretive material and textual information.  Steinman Decl., ¶¶ 4-8.  Specifically, a visitor to the Museum's Website would first click through from the Website's homepage to the "Exhibitions" section, then to a sub-page dedicated to "Current Exhibitions" or "Past Exhibitions" (the Exhibition has now ended), and then to the landing page for the Online Exhibition Catalogue for the Exhibition (the "Exhibition Page").  Steinman Decl., Ex. B.  The Exhibition Page provides an Exhibition Overview, explaining that "The instruments used in rock and roll had a profound impact on this art form that forever changed music."  The Exhibition Page also contains a video titled the *Play It Loud Primer*, portraying the "iconic instruments" and "interviews with legendary musicians, as well as new rock stars" – allowing the viewer to "experience some of the defining moments of rock and roll."  From the Exhibition Page, Website visitors can click through to an Exhibition Gallery page (Steinman Decl., Ex. C), which contains an exegesis of the cultural import of Rock and Roll and its instruments beginning as follows:

> "Loud" is not just the description of a sound. It is an attitude. Rock and roll musicians took "loud" and built it into one of the defining artistic movements of the twentieth century. Fashion, art, politics—all were influenced by rock music and its countercultural appeal. The wail of the electric guitar and the distortion of amplifiers became the currency of early rock musicians, who understood the power of volume to command attention like never before. That sound—piercing, pounding, vibrating through audiences—would evolve into rock and roll's signature.

Steinman Decl., Ex. C.

From the Exhibition Page, Website visitors also can click through to the sub-page dedicated to "Exhibition Objects," a listing of all of the Exhibition's 185 objects (130 musical instruments plus 55 complimentary objects) in the order they were presented in the Museum's galleries – thus allowing the virtual visitor to walk through the Exhibition free of charge. Steinman Decl., Ex. D.  Each object in the Online Exhibition Catalogue is accompanied by descriptive text noting its historical significance, a technical description, and object details.  The "Frankenstein" guitar is the 22nd object featured.  If a visitor then further clicks on the thumbnail photo of the "Frankenstein" guitar, the visitor lands on the sub-page dedicated to the individual Exhibition object (the "Frankenstein Guitar Page").  Steinman Decl., Ex. E.  Upon finally reaching this page, a virtual visitor, for the first time, would see a thumbnail version of Plaintiff's Photo, alongside two other photographs of the "Frankenstein" guitar not at issue depicting Van Halen's customizations to the instrument, the front of the object showing artistic details, and the verso showing the sound components – and a slightly larger version of any of the three photos if the thumbnail is selected.  *Id.*  The Frankenstein Guitar Page also includes extensive text regarding the instrument's artist (*i.e.*, Van Halen), history, creation, dimensions, weight, date, medium, and ownership information, as well as a highly detailed technical description of its components.  *Id.*  For example, it explains that the guitar was "pieced together by Van Halen from modified factory seconds and mismatched odd lot parts," combines "some of the most

7

desirable elements of Gibson and Fender guitars," was created to perfect what was to become

Van Halen's signature sound by creating the ultimate guitar for "tone, playability, dependability

and functionality," "spawned legions of copies," and is considered to be "one of the most

recognizable guitars of all time."  Steinman Decl., Ex. E.

## ARGUMENT

### I.   FAIR USE WARRANTS DISMISSAL OF THIS ACTION

A court may dismiss a copyright infringement claim on fair use grounds at the pleading

stage.  *Swatch,* 756 F.3d at 86 (affirming district court's pre-discovery fair use ruling);

*Lombardo v. Dr. Seuss Enters., L.P.*, 279 F. Supp. 3d 497, 504-05 (S.D.N.Y. 2017) ("Numerous

courts in this district have resolved the issue of fair use on a motion for judgment on the

pleadings by conducting a side-by-side comparison of the works at issue.") (internal citation

omitted).[7]  This is precisely the type of case where dismissal at the pleading stage is warranted.

The Court needs only the Complaint, together with the exhibits attached thereto or the Museum's

Website incorporated in it by reference, to decide the question of fair use.

### II.   SINCE ALL OF THE RELEVANT FACTORS WEIGH IN FAVOR OF FAIR USE, THIS COURT SHOULD DISMISS THE COMPLAINT

The preamble to Section 107 provides that "the fair use of a copyrighted work . . . for

purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is

not an infringement of copyright." 17 U.S.C. §107 (emphasis added).  This is because "[t]he

primary objective of copyright is not to reward the labor of authors, but '[t]o promote the

---

[7] *See also Clark v. Transportation Alternatives, Inc.*, No. 18 Civ. 9985 (VM), 2019 WL 1448448 at *5 (S.D.N.Y. Mar. 18, 2019) (granting motion to dismiss copyright action on fair use grounds involving the use of a photograph in newspaper website); *Arrow Prods., LTD. v. Weinstein Co.*, 44 F. Supp. 3d 359, 368 (S.D.N.Y. 2014) ("[a]ll that is necessary for the court to make a determination as to fair use are the two films at issue"), *aff'd*, 729 F. App'x 131 (2d Cir. 2018); *Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512, 527 (S.D.N.Y. 2015); *Sedgwick Claims Mgmt. Servs., Inc. v. Delsman*, No. C 09-1468 SBA, 2009 WL 2157573 at *4 (N.D. Cal. July 17, 2009) (granting defendant's motion to dismiss copyright claim based on use of photos on defendant's website), *aff'd*, 422 F. App'x 651 (9th Cir. 2011).

Progress of Science and useful Arts' . . . [and to encourage] others to build freely upon the ideas and information conveyed by a work."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991) (*quoting* U.S. Const. art. I, § 8, cl. 8 and *citing Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556-57 (1985)).  As the Supreme Court remarked in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575, 114 S. Ct. 1164 (1994), "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill" that very constitutional purpose.  Similarly, as the Second Circuit later emphasized in *Blanch v. Koons,* 467 F.3d 244, 250 (2d Cir. 2006), citing Judge Leval's seminal law review article, "'The monopoly created by copyright thus rewards the individual author in order to benefit the public." (Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105, 1108 (1990)) "At the same time, though, excessively broad protection would stifle, rather than advance, the [law's] objective.  (*Id.* at 1109) Monopoly protection of intellectual property that impeded referential analysis . . .  would strangle the creative process.". *Id.* at 1108.

Following the preamble, Section 107 of the Copyright Act lists four factors that courts must consider in determining whether a particular use of a copyrighted work is a fair use:

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. §107.  These four factors must be considered together, and none may be "treated in isolation."  *Campbell*, 510 U.S. at 578.  They are non-exclusive, and "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set

forth in § 107 weighs in their favor."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476-77 (2d Cir.

2004).  Here, the four factor analysis weighs heavily in favor of fair use, and the use of the Photo

in the Online Exhibition Catalogue promotes "the Progress of science and useful Arts."  U.S.

Const., art. I, §8, cl. 8.

> **A.  The Purpose and Character of The Museum's Use of the Photo Was Unquestionably Noncommercial and Transformative**

The first factor, the purpose and character of the secondary use of a copyrighted work, is

considered the "heart of the fair use inquiry."  *Davis v. The Gap, Inc*., 246 F.3d 152, 174 (2d

Cir. 2001).  It includes two considerations.  One is "whether the use is of a commercial nature or

is for nonprofit educational purposes" – an "explicit part of the first fair-use factor."  17 U.S.C.

§107(1); *Blanch*, 467 F.3d at 253.  The second is whether the use is "transformative."  Both

considerations strongly favor the Museum.

> **1.  The Museum's Use of the Photo was Noncommercial**

In stark contrast to the context in Plaintiff's cited cases, the Museum's use of the Photo is

for a clear nonprofit educational purpose.  This factor is "sufficiently weighty" that the first

factor can favor a finding of fair use even where a nonprofit educational use is not

transformative.  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1263, 1267 (11th Cir. 2014);

*see also Campbell*, 510 U.S. at 579 n.11 (nonprofit educational use such as straight reproduction

of multiple copies for classroom distribution may weigh in favor of fair use under first factor).

Here, the Museum is a preeminent nonprofit educational institution – a registered

Section 501(c)(3) nonprofit organization.  Rule 7.1 Statement [Dkt. No. 11].  Moreover, the

contested use itself was a non-commercial educational use, namely providing interpretive

information on an Exhibition object in an Online Exhibition Catalogue in furtherance of the

Museum's mission to serve the public good through the presentation and study of fine art.  The

Museum created pages on the Online Exhibition Catalogue containing similar information for each of the 185 objects included in the Exhibition, including one for the "Frankenstein" guitar.

Plaintiff bases his whole argument that the Museum's use of the Photo was commercial on the assertion that the Museum charges a general admission fee to enter the Museum.  (Pl. Mem., pgs. 1, 5-6).  In fact, this general admission fee is only charged to out of town visitors and not New York State residents, local students, or Museum members, and the website, including the Online Exhibition Catalogue, is available to the public at no charge.  Steinman Decl., Ex. F. More importantly, under settled law, the critical issue under this aspect of the first factor is whether the Museum directly used the Photo to generate significant revenues, which it plainly did not:

> The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work.
>
> Consistent with these principles, courts will not sustain a claimed defense of fair use when the secondary use can fairly be characterized as a form of commercial exploitation, *i.e.*, when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material. Conversely, courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest.  The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair.

*Blanch*, 467 F.3d at 253 (emphasis added), citing *Geophysical Union v. Texaco*, 60 F.3d 913, 922 (2d Cir. 1994).  Thus, for example, in *Cambridge University Press*, the Eleventh Circuit found that the first factor weighed heavily in the university's favor because "There is no evidence that [the university] captures significant revenues as a direct consequence of copying [chapters from the plaintiff's books for e-reserves]" – even though the university "certainly

benefits from its use of Plaintiff's works by being able to provide the works conveniently to students and profits in the sense that it avoids paying licensing fees."  769 F.3d at 1267.

In sum, the first factor strongly weighs in the Museum's favor given its nonprofit educational use.  The Museum did not acquire conspicuous financial rewards from its use of the Photo and instead used it to serve a public informational purpose.  *See Swatch*, 756 F. 3d at 82 (finding fair use where the defendant serves a "public purpose" by providing news and information affecting the financial markets).[8]

### 2.    The Museum's Use was Transformative as to Purpose and Context

In addition to being noncommercial, the Museum's use of the Photo was "transformative."  The key question in this inquiry is "'whether the new work merely supersede(s) the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *Bill Graham Archives*, 448 F.3d at 608, *quoting Campbell,* 510 U.S. at 579; *see also Authors Guild v. Google Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (whether the new use "communicates something new and different from the original or expands its utility.").  "If the secondary use adds value to the original – if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  *Blanch*, 467 F.3d at 251-52, quoting *Castle Rock Entm't v. Carol Publ'g Group*, 150

---

[8] Even assuming, *arguendo*, that the Museum's use of the Photo were deemed commercial, that finding would still not turn this factor in Plaintiff's favor. *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) ("we do not place much significance on that fact [that the works were sold commercially] due to the transformative nature of the work"); *Bill Graham Archives*, 448 F.3d at 612 (biography of Grateful Dead did not seek to exploit the plaintiff's images' expressive value for commercial gain); *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 156 (2d Cir. 1990) ("To be sure, the author and appellant want to make a profit in publishing the book.  But the author's use of material 'to enrich' his biography is protected fair use, 'notwithstanding that he and his publisher anticipate profits'").

F.3d 132, 142 (2d Cir. 1998).  Contrary to Plaintiff's suggestion, a secondary work "can be transformative in function or purpose without altering or actually adding to the original work." *Swatch*, 756 F. 3d at 84, *quoting A.V. ex rel. Vanderhye v. Paradigms, LLC*, 562 F. 3d 630, 639 (4th Cir. 2009) and *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F. 3d 1146, 1165 (9th Cir. 2007). Here, the Museum's use of the Photo in the Online Exhibition Catalogue is highly transformative.

The most relevant case on point is the Second Circuit's decision in *Bill Graham Archives,* 448 F.3d 605, which Plaintiff neglects to address.  In that case, the defendant book publisher, Dorling Kindersley ("DK"), included unlicensed photographs of concert posters as part of a timeline in a biography of the Grateful Dead band.  In finding fair use, the Second Circuit first emphasized that this was a scholarly use, and recognized that "forms of historic scholarship" often require incorporation of other material for "optimum treatment of their subjects."  *Id.* at 609.  The court further observed that, "No less a recognition of biographical value is warranted in this case simply because the subject made a mark in pop culture rather than some other area of human endeavor."  *Id.*  The Second Circuit next emphasized that "DK's purpose in using the copyrighted images at issue in its biography of the Grateful Dead is plainly different from the original purpose for which they were created."  *Id.*  The court found that the defendant, like the Museum here, utilized the subject photos "to emphasize" the images' "historical rather than creative value."  *Id.* at 612-13.  As the court underscored in a key holding of the case, DK used the plaintiff's images "as *historical artifacts* to document and represent the *actual occurrence* of Grateful Dead concert events."  *Id*. at 609 (emphasis added).

Next, the Second Circuit held that the image of the concert posters served a transformative purpose as historical artifacts graphically representing the significant Grateful

Dead concert events, even though there was no direct text in the DK book commenting on the posters. The court explicitly rejected the notion that DK was "required to discuss the artistic merits of the images to satisfy this first factor of fair use analysis" and found the use to be transformative merely because the images "enhanced the biographical information" in the book. *Bill Graham Archives*, 448 F.3d at 610-11.

Next, the Second Circuit emphasized that its conclusions were strengthened by the fact that DK had presented the image in combination with ". . . a prominent timeline, textual material, and original artwork, to create a collage of text and images . . . that ensure that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain." *Bill Graham Archives*, 448 F.3d at 611. It also found relevant that the "images constitute an inconsequential portion of" the book.[9]

This case is closely analogous to *Bill Graham Archives*. First, the Museum has used the Photo in a scholarly context, namely in an Online Exhibition Catalogue that is chock full of scholarly information. As suggested by the quote from the College Art Association set forth in the Preliminary Statement, the Online Exhibition Catalogue, including its use of the Photo, provided contextual information regarding the instruments highlighted in the Exhibition and thereby enhanced the public's understanding of their relevance, and provided some of the

---

[9] *Bill Graham Archives* is widely followed. For example, in *SOFA Entertainment v. Dodger Productions*, 709 F.3d 1273, 1278 (9th Cir. 2013), the Ninth Circuit relied on *Bill Graham Archives* to hold that it was fair use for the "Jersey Boys" musical to use a clip of the Ed Sullivan Show as historical evidence "to mark an important moment in the band's career" - and thus as a "biographical anchor" - rather than for its own entertainment value. *See also Warren Publishing Co. v Spurlock*, 645 F. Supp. 2d 402, 417- 21 (E.D. Pa. 2009)(as in *Bill Graham Archives*, scholarly work on artist used his magazine covers "'as historical artifacts to document and represent' the work product of an accomplished artist"); and *Red Label Music Publishing v. Chila Productions*, 388 F. Supp. 3d 975, 984-85 (N.D. Ill. 2019) (finding fair use where "The film uses snippets of the *Super Bowl Shuffle* as part of the historical record to tell stories of . . . major events in [the Chicago] Bears history" akin to the "historical artifacts" in *Bill Graham Archives*; "The filmmakers, then, used the *Super Bowl Shuffle* "'not for its expressive content but rather for its factual content.'").

benefits of a physical visit to the Museum to the virtual visitor for free.  Moreover, as with

biographies, museum exhibition catalogues often require incorporation of other material such as

the Photo for "optimum treatment of their subjects."  *Id.* at 609.

Critically, as in *Bill Graham Archives*, the parties' respective purposes here were entirely

different.  Plaintiff explicitly states that he created the Photo "for the purpose of showing what

Van Halen looks like in performance."  Pl. Mem., p. 5 (emphasis added).  The Museum's

purpose, as plainly evidenced on its Online Exhibition Catalogue, was instead to provide factual,

historical information about the "Frankenstein" guitar and to accentuate the historical

significance of that instrument as a work of art.  As the accompanying commentary underscored,

Van Halen sought a sound that was unavailable in the market, so he himself cobbled together

components from two different brands of guitar to help create what was to become his signature

sound, which would electrify his performance.  The Museum did not display the Photo merely to

depict a rock star in concert, as Plaintiff suggests, or to emphasize the Photo's expressive

qualities, but rather for a historical purpose – namely to show that Van Halen played his

ingenious creation in concert, and to further inform the public that the actual "Frankenstein"

guitar was available for viewing in the Museum as part of the Exhibition.

In short, as in *Bill Graham Archives*, the Museum used the Photo as a "*historical artifact

[ ]* to document and represent the *actual occurrence* of" Van Halen's playing a musical

instrument he created that was part of the "Play It Loud" Exhibition.  *Id*. at 609 (emphasis

added).  Likewise, in a fashion similar to a concert poster image in *Bill Graham Archives,* which

served "as a recognizable representation of the [Grateful Dead] concert" and "documents concert

information and provides notable historic details," the Photo serves as a recognizable

representation of the use of the "Frankenstein" guitar by Van Halen and depicts its historic use, including how it was to be played.

Further, Plaintiff's argument that the Museum's use is not transformative because it does not discuss or provide commentary on "the artistic merits of the" Photo is unavailing under *Bill Graham Archives*.  Instead, the Museum's Online Exhibition Catalogue provides commentary on the "Frankenstein" guitar – the art object depicted within the Photo.  This includes the textual explanations of its mish-mash construction by Van Halen from the most desirable elements of other guitars "to achieve the ultimate guitar for tone, playability, dependability and functionality," a highly detailed "Technical Description" of the guitar, and details regarding its date, medium, dimensions, and classification.  In short, under *Bill Graham Archives*, merely by "enhancing the biographical [and scholarly] information" in the Museum's Online Exhibition Catalogue, the Museum's use of the Photo was transformative.  *Id*. at 610.  It matters not that the Online Exhibition Catalogue did not comment on the Photo *per se,* but only on the art object depicted therein.

Finally, the Museum's use here was very similar to the use referenced in *Bill Graham Archives* in that the Museum included the Photo as a single image within a massive collage of text, images and videos on the Online Exhibition Catalogue, with its 185 Exhibition objects, extending and enhancing the experience of the Exhibition for those visitors to the Online Exhibition Catalogue as a primer to prepare for the Exhibition in the Museum's galleries, for further study after visiting the Exhibition, or to those visitors to the Website who will never experience the bricks-and-mortar Exhibition first-hand.  As in *Bill Graham Archives*, the Photo – which is found deep within the Online Exhibition Catalogues on a single Exhibition Object page – is "an inconsequential portion of" the Museum's overall Website or even its Online Exhibition

16

Catalogue.  *Id.* at 611.  Additionally, the lay-out of the Frankenstein Guitar Page, and the relatively small size of the Photo, juxtaposed against the static images featuring the front and back of the instrument, ensured that the focus was the "Frankenstein" guitar, not the subject Photo.  In sum, the Museum's use of the Photo was transformative as a historical artifact used in a scholarly context.

Separate and apart from *Bill Graham Archives*, another line of cases provides additional support for the proposition that the Museum's use is transformative.  An online exhibition catalog is an electronic reference tool.  In *Authors Guild v. Google,* the Second Circuit held that Google's use of copyrighted materials in its "Snippet View" function in Google Books, an electronic reference tool, was "highly transformative" – stating that "the purpose of  Google's copying of the original copyrighted books is to make available significant information about those books, permitting a searcher to identify those that contain a word or term of interest (search function) . . . Google's division of the page into tiny snippets is designed to show the searcher just enough context surrounding the searched term to help her evaluate whether the book falls within the scope of her interest (Snippet View)."  *Authors Guild*, 804 F.3d at 218.  Here, the Museum admittedly used in its Online Exhibition Catalog not only static images of the Exhibition Object standing alone (not at issue in the complaint), but Plaintiff's Photo of the object being played by the creator.  Nonetheless, as in the Google Books case, the purpose is to provide context and information about the "Frankenstein" guitar to help members of the public understand aspects of interest regarding an Exhibition Object.  For this additional reason, the use qualifies as transformative.

### 3.    Plaintiff Inexplicably Relies Heavily on "News Reporting" Cases Involving Media Companies

While Plaintiff ignores *Bill Graham Archives*, his Memo relies heavily on an inapplicable line of cases involving the use of a photograph in a news story by a commercial media organization.  Based on these "news reporting" cases, he argues that the Museum's use is not transformative because it "did not report on any political or social controversy that arose because of the very existence of the Photograph itself," nor was "the copyrighted work . . . itself the subject of the story."  Pl. Mem., pp. 3-5, citing *Barcroft Media Ltd. v. Coed Media Grp., LLC*, 16-cv-7634 (JMC), 2017 WL 5032993 (S.D.N.Y. Nov. 2, 2017) (finding no fair use where a gossip website used copyrighted paparazzi photographs of celebrities in conjunction with unrelated stories about those celebrities); *BWP Media United States, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 404 (S.D.N.Y. 2016) (defendant gossip website used copyrighted paparazzi photos without commenting on those photos or critiquing their source ); *Otto*, 345 F. Supp. 3d at 429 (for-profit media website used a copyrighted photo of President Trump at a wedding reception held at a club owned by him for the same purpose as the photo's author – to portray a newsworthy event).[10]

Plaintiff's brief misses the point entirely.  The Museum is *not* a for-profit media company, and it has not used the Photo to report the news or make use of paparazzi photos for

---

[10] *See also* Plaintiff's citations to *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) (finding fair use because the revealing photographs taken from a modeling portfolio were the subject matter of the news stories concerning the model's suitability for a beauty contest); *Konangataa v. Am. Broadcasting Companies, Inc.*, 2017 WL 2684067 (S.D.N.Y. June 21, 2017) (finding fair use where a publisher included a live-streaming video of a child birth with a news story regarding the appropriateness of the father posting that video on social media); *Psihoyos v. Nat'l Exam'r*, No. 97 Civ. 7924 (JSM), 1998 WL 336655 (S.D.N.Y. June 22, 1998) (for-profit website used a copyrighted photo of an automobile where the purpose in doing so was the same as that of the author of said photograph).  Plaintiff also oddly cites *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013), which has no relevance here; there the court held that Meltwater's news aggregation service of headlines and squibs scraped from news websites merely reproduced verbatim the AP's original breaking news content.

celebrity gossip purposes.  Plaintiff's 30 plus year old Photo is not time-sensitive in its depiction

of events or controversies.  In short, the above-cited line of authorities relied upon by Plaintiff

related specifically to "news reporting" are inapplicable to the Museum's use of the Photo.

Conversely, as *Bill Graham Archives* establishes, the Museum did not need to comment on an

artistic, political, or social controversy regarding the Photo for its use to be transformative.  The

Museum's use was unquestionably noncommercial and transformative in its display of the Photo

as a historical artifact, and thus the first factor overwhelmingly supports a finding of fair use.

### B.     The Nature of the Photo Supports a Fair Use Determination

The second fair use factor, the "nature of the copyrighted work" focuses on two

considerations.  First, "when the copyright material is unpublished, the second fair use factor

weighs heavily in favor of the plaintiff."  *Blanch*, 467 F.3d at 256; *see also Harper & Row*

*Publishers,* 471 U.S. 539 (adjudicating the scoop of a key newsworthy excerpt from President

Ford's not-yet-released book).  Second, works fall on a spectrum between factual and creative,

and those exhibiting the greatest creativity warrant more protection.  *See Cambridge University*

*Press*, 769 F.3d at 1268 (recognizing "gradations as to the relative portion of fact and fancy").

In this case, the Museum's use satisfies both considerations.  First, the Photo is a

previously published, widely available, 30 plus year old image.  Moreover, with both factual and

creative elements, it falls somewhere in the middle of the spectrum.[11]  In light of the Photo's age

---

[11] *Philpot v. Media Research Center Inc*., 279 F. Supp. 3d 708 (E.D. Va. 2018) (In case finding that the
nonprofit media company made a fair use of photos depicting Kenny Chesney and Kid Rock in concert,
court found that stock photos of musicians in concert are "likely both factual and creative in nature"); *see
also North Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) ("Courts analyzing
. . . photographic works created for . . . non-artistic purposes have found this factor to weigh in favor of
fair use."); *Katz v. Chevaldina*, No. 12-22211-CIV., 2014 WL 2815496 at *8 (S.D. Fla. June 17, 2014)
(where there was "no evidence that the photographer influenced . . . the [subject's] activity, pose,
expression or clothing [when that subject appeared in public and was unknowingly photographed]" and
the photograph conveyed no creative ideas, this factor weighed in favor of fair use), *aff'd*, *Katz v. Google
Inc.*, 802 F.3d 1178, 1183 (11th Cir. 2015).

and widespread availability, the second factor here favors fair use.  See Arica Inst., Inc. v.

Palmer, 970 F.2d 1067, 1078 (2d Cir. 1992) (holding that second factor favored fair use because

the work was "a published work available to the general public"); *Bill Graham Archives*, 386 F.

Supp. 2d at 330 ("This circuit has mitigated the importance of creativity in the second factor

where a work is a published work available to the general public" (citation and internal quotation

marks omitted)); *Perfect 10, Inc.*, 508 F.3d at 1167 (where work appeared on the Internet before

a defendant copies it, this strengthens a finding of fair use).

Moreover, "The second factor has rarely played a significant role in the determination of

a fair use dispute." *Authors Guild*, 804 F.3d at 220.  This is particularly the case where the use is

transformative.  As the Second Circuit stated in *Blanch*, "the second fair-use factor has limited

weight in our analysis because [defendant] used [plaintiff's] work in a transformative

manner . . . ."  467 F.3d at 257; s*ee also Cariou*, 714 F.3d at 710; and *Bill Graham Archives*, 448

F.3d at 612.

### C.    The Amount and Substantiality of The Museum's Use Weighs in Favor of Fair Use

The third factor, the amount and substantiality of the portion of the copyrighted material

used in relation to the copyrighted work as a whole, though neutral here, is fully consistent with

a finding of fair use.  The operative inquiry is whether "the quantity and value of the materials

used are reasonable in relation to the purpose of the copying."  *Blanch*, 467 F.3d at 257 (quotes

and citation omitted); *see also Campbell*, 510 U.S. at 586-87.  "As the Second Circuit has noted,

there are no absolute rules as to how much of a copyrighted work may be copied and still be

considered a fair use."  *North Jersey Media*, 74 F. Supp. 3d at 620-21 (citing *Authors Guild, Inc.

v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014)).  Copying of an entire work may constitute a fair

use where such a use is reasonable in light of the defendant's purpose, as in *Swatch,* 756 F.3d at

90, where the defendant reproduced an entire earnings report call. *See also Nunez*, 235 F.3d at 24 (copying of less than entire image would have been useless).

The third factor "weighs less when considering a photograph – where all or most of the work often must be used in order to preserve any meaning at all – than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007). Moreover, as a courtesy to photographers, it is generally considered appropriate not to crop their work. For these reasons, it was reasonable for the Museum to use the full Photo uncropped; indeed, using a significantly cropped photo would not have served the same educational purpose of demonstrating Van Halen's use of his self-created guitar.

Further, the Museum used the Photo in a small size, appropriate for supporting material. The image size that appears on the Museum's Online Exhibition Catalogue is 600 x 480 pixels, for a total of 288,000 pixels. Steinman Decl., para. 12. Such use of a reduced version of a work is, in and of itself, less consequential. *See Perfect 10, Inc.*, 508 F. 3d at 1168 ("use of thumbnails did not hurt . . . market for full-size images"). Moreover, as in *Bill Graham Archives,* the Museum defendant "displayed [the] reduced versions of the original images and intermingled these visuals with text and original graphic art" – as well as displaying the Photo in context among the other 184 Exhibition Objects, all of which contained similar interpretive material. *Bill Graham Archives*, 448 F.3d at 613.

D.    **The Museum's Use Has No Impact on the Potential Market For or Value of the Subject Photograph**

The fourth and final factor requires consideration of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. §107(4). The Court must determine "whether the secondary use *usurps* the market of the original work" by serving as a

market substitute.  *Blanch*, 467 F.3d at 258..  The key inquiry is "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."  *Authors Guild*, 804 F.3d at 223-24.  For the fourth factor to favor a rightsholder, "There must be a *meaningful or significant effect* upon the potential market for or value of the copyrighted work."  *Id.* (emphasis added).  Moreover, the harm to the value of the original must be "more than speculative."  *Otto*, 345 F. Supp. 3d at 431-32.  Further, the Second Circuit has determined that a secondary user only "usurps" a market for a copyrighted work "where the infringer's target audience and the nature of the infringing content is the same as the original."  *Cariou*, 714 F. 3d at 709.  Finally, although derivative markets are not irrelevant, the fourth factor "does not focus principally on the question of damage to [a] derivative market."  *Id.* at 708.

The courts also have broadly recognized that, "by definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties."  *Bill Graham Archives*, 448 F.3d at 614, quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4] (2005).  Accordingly, the Second Circuit repeatedly has held that a copyright plaintiff is not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense.  *See*, *e.g.*, *Bill Graham Archives*, 448 F.3d at 614.  A copyright holder cannot prevent others from entering fair use markets merely "by developing or licensing a market for . . . news reporting, educational or other transformative uses of its own creative work."  *Castle Rock Entm't, Inc.*, 150 F. 3d at 146 n.11.  In short, "copyright owners may not preempt exploitation of transformative markets.  *Id.*

In *Bill Graham Archives*, the Second Circuit stated that a court must "look at the impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets" and held that a "transformative market" does not qualify as a traditional market. 448 F.3d at 614. (internal quotation omitted).  Thus, the *Bill Graham Archives* court held that since the defendant's use of the images in that case as historical artifacts "falls within a transformative market, [plaintiff] does not suffer market harm due to the loss of license fees." *Id.* at 615.

The same logic applies here.  As established above, the Museum's non-commercial use of the Photo as a historical artifact in a free, publicly available Online Exhibition Catalogue falls within the transformative market, and therefore Plaintiff does not suffer cognizable harm if there is no license.  As a matter of common sense, there is nothing about the Museum's use of the 30 plus year old Photo in its Online Exhibition Catalogue that would act as a substitute for the original, lead potential purchasers to opt to acquire the copy in preference to the original, or harm Marano's future licensing opportunities in his traditional markets, such as articles in the popular press.  Notably, although Plaintiff could have submitted an affidavit or other evidentiary proof in response to the Order to Show Cause, he has submitted *no* evidence demonstrating that the Museum's use has caused "a *meaningful or significant effect* upon the potential market for or value of the copyrighted work." *Authors Guild*, 804 F.3d at 223-24.  Undoubtedly, there is a narrow market for uses of the Photo as a historical artifact in noncommercial publications by nonprofit museums focused on the exhibit of the "Frankenstein" guitar, and thus the Museum's use would not lead to a significant impact on the value of Plaintiff's Photo.

The cases cited by Plaintiff to demonstrate the type of market harm that Courts find cognizable are readily distinguishable.  For example, in *Otto*, the defendant for-profit newspaper published a previously unpublished, time-sensitive photograph of President Donald Trump

wandering into a wedding at a golf club he owned in New Jersey. The Court declined to find fair use, in part due to the fourth factor, because "Publishing the [p]hotograph [of the President crashing the wedding] without permission essentially destroys the primary market for its use." *Otto*, 345 F. Supp. 3d at 432; *see also* Pl. Mem. citing *Fitzgerald*, 491 F. Supp. 2d at 189 (finding market harm from media use where media outfits were the "only market the photos could reasonably have").  As the *Otto* court stated, "Allowing a news publisher to poach an image from an individual's social media account for an article that does little more than describe the setting of the image does not promote 'the Progress of science and useful Arts.'"  *Id.* at 433, quoting U.S. Const., art. I, § 8, cl. 8.  In stark contrast, the Museum's non-commercial, scholarly use of an old photograph does promote the useful Arts and does not destroy the primary market for the Photo.

Finally, Plaintiff is misleading in his assertion that, "As a threshold matter, the Court may presume market harm because Defendant's secondary use constituted a mere duplication of Plaintiff's original photographs," citing *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).  Pl. Memo at 7.  (*Sony* is the "Betamax case" in which the Supreme Court held that the duplication of television shows for private non-commercial time-shifting purposes was a fair use.)  In *Campbell*, 510 U.S. at 590, the Supreme Court clarified *Sony* and stated that any presumption of market harm applies only where there is both "*mere duplication* for *commercial purposes*" (as in the instance of a blatant commercial rip-off).  Further, it reiterated that such a presumption only applies to non-transformative uses.  Notably, no such presumption was applied in cases such as *Swatch* or *Cariou,* where the defendant's purposes were far more commercial than the Museum's use here.  Rather, the Second Circuit underscored in *Swatch* that the fourth factor analysis should involve a careful "balancing of the benefit the public will derive

if the use if permitted and the personal gain the copyright owner will receive if the use is denied." *Swatch*, 756 F.3d at 90.

Here, the Museum did not engage in "mere duplication for commercial purposes." Its use was noncommercial, scholarly, and transformative, and designed to benefit the public. Thus, the fourth and final factor also supports a finding of fair use.

Finally, a court must consider all of the factors are as a whole, and with an eye toward the full context. Here, the Museum's use of a Photo in a free, scholarly Online Exhibition Catalogue as an historical artifact contextualizing a musical instrument on exhibit in the Museum is exactly the type of use protected by the fair use doctrine. As Judge Leval wrote, "Monopoly protection of intellectual property that impeded" such scholarly analysis "would strangle the creative process." *Blanch,* 467 F.3d at 250 (citing Leval, 103 Harv. L. Rev. at 1108).

## CONCLUSION

For all of the foregoing reasons, the Museum respectfully requests that the Court: (1) dismiss the Complaint in its entirety with prejudice; and (2) award The Museum its attorneys' fees and costs as the prevailing party pursuant to 17 U.S.C. § 505.

DATED:  October 23, 2019

Respectfully submitted,

**DAVIS WRIGHT TREMAINE LLP**

By:   */s/Linda Steinman*
Linda Steinman
1251 Avenue of the Americas, 21st Floor
New York, New York  10020
Phone:  (212) 603-6409
Fax:  (212) 489-8340
LindaSteinman@dwt.com

*Counsel for Defendant*
*The Metropolitan Museum of Art*