USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/13/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
LAWRENCE MARANO,                         :
                                         :
                          Plaintiff,     :
                                         :
          -against-                      :
                                         :
THE METROPOLITAN MUSEUM OF ART,          :
                                         :
                          Defendant.     :
------------------------------------------------------------ X

19-CV-8606 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiff Lawrence Marano ("Marano" or "Plaintiff") sued the Metropolitan Museum of

Art ("Met" or "Defendant") for willful copyright infringement under Sections 106 and 501 of the

Copyright Act, 17 U.S.C. §§ 106, 501.  Compl. (Dkt. 1) ¶¶ 13–15.  The Court ordered Plaintiff to

show cause why this case should not be dismissed under the fair use exception of the Copyright

Act, 17 U.S.C. § 107.  (Dkt. 5).  As detailed below, because Plaintiff has failed to show why the

Met's use of his photograph (the "Photo") is not protected by the fair use exception, the case is

DISMISSED.

## BACKGROUND[1]

Plaintiff is a Florida-based professional photographer who owns the copyright to the

Photo, a photograph of Eddie Van Halen ("Van Halen") performing at a concert.  Compl. ¶¶ 5,

---

[1]    The facts are based on the allegations contained in the Complaint, materials attached to the Complaint, and the Met's "Play It Loud" online exhibition (*see* https://www.metmuseum.org/exhibitions/listings/2019/play-it-loud).  The Court accepts all well-pled, non-conclusory factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiff.  *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court considers the Met's online exhibition *in toto* because the Complaint references it repeatedly and provides screenshots from it, it is critical to Plaintiff's allegations, and neither party contests the website's accuracy.  *See* Compl. ¶¶ 6, 10–11, 13; Compl., Ex. B (Dkt. 1-2); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[A complaint] is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . . Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (quotations omitted)); *Stephens v. Trump Org. LLC*, 205 F. Supp. 3d 305, 310 n.7 (E.D.N.Y. 2016) (taking judicial notice of "the website hosted at 'trumpestates.com'" where screenshots of the

1

7–8; Compl., Ex. A (Dkt. 1-1).  The Met is a nonprofit museum that "collects, studies, conserves, and presents significant works of art across all times and cultures in order to connect people to creativity, knowledge, and ideas."  Steinman Decl., Ex. A (Dkt. 15-1); *see* Corporate Disclosure Statement (Dkt. 11).[2]  Plaintiff alleges that the Met infringed his copyright by posting the Photo to the museum's website.[3]  Compl. ¶¶ 10, 13; Compl., Ex. B (Dkt. 1-2).

The Met included the Photo in its online catalogue for the "Play It Loud: Instruments of Rock & Roll" exhibition,[4] which "examine[d] the instruments of rock and roll" from "[o]ne of the most important artistic movements of the twentieth century."  Steinman Decl., Ex. B (Dkt. 15-2).  The online catalogue corresponds to the physical exhibition previously displayed in a gallery at the museum and is freely accessible.  *Id.*  To browse the online catalogue, visitors start on a landing page and from there can proceed to three main sub-pages—"Exhibition Overview," "Exhibition Galleries," and "Exhibition Objects"—that provide interpretive text, photographs, and multimedia presentations about the instruments that were in the exhibition.  *Id.*

To reach Plaintiff's copyrighted Photo, a visitor must first navigate to "Exhibition Objects," which lists as thumbnails the 185 objects that were on physical display in the museum

---

website's contents were submitted to the court "without any party raising any dispute as to the website's authenticity").  The Court refers to excerpts of the online exhibition attached to the declaration of Linda Steinman dated October 23, 2019 ("Steinman Decl.") (Dkt. 15).

[2]     The Court takes judicial notice of Defendant's Corporate Disclosure Statement, which certifies that "Defendant THE METROPOLITAN MUSEUM OF ART is a 501(c)(3) organization with no corporate parents or publicly held shares."  *See Garcia v. Salvation Army*, 918 F.3d 997, 1002 n.9 (9th Cir. 2019) (taking judicial notice of the Salvation Army's nonprofit status).

[3]     In his response to the Court's Order to Show Cause, Plaintiff asserts that the Met used the Photo in the brick and mortar museum as well as in the online catalogue for the exhibition.  Pl. Resp. (Dkt. 9) at 1.  That might be true, but the Complaint includes no allegations regarding use of the Photo at the Met; it complains only of use of the Photo as part of the online catalogue.  That said, this decision would be the same even if the Complaint alleged misuse of the Photo in the physical exhibition also.

[4]     The online catalogue can be found at https://www.metmuseum.org/exhibitions/listings/2019/play-it-loud. The Photo itself is posted to https://www.metmuseum.org/art/collection/search/752454.  Compl. ¶ 10; Compl., Ex. B.  As of the date of this Opinion, both webpages are up and available.

as part of the "Play It Loud" exhibition.  Steinman Decl., Ex. D (Dkt. 15-4).  Visitors must then

click on the "Frankenstein" guitar thumbnail—the guitar designed and assembled by Van Halen.

The following page displays two paragraphs on the left side with historical and technical

information about the guitar.[5]  Compl., Ex. B; Steinman Decl., Ex. E (Dkt. 15-5).  To the right of

that text there is a large photograph of the guitar and three smaller thumbnail photographs

beneath it.  The third thumbnail photograph is the copyrighted Photo;[6] the other two are

photographs of the "Frankenstein" guitar on display in the gallery.  Visitors can view a larger

version of any of the three photographs by clicking on it.  Beneath the historical text and the

photos, the page includes another section of text devoted to "Object Details"; that section

provides basic information about the guitar, including, *inter alia*, the materials it was made of

and its dimensions.

On September 16, 2019, Plaintiff filed his Complaint, and on September 18, 2019, the

Court ordered him to show cause why this action should not be dismissed under the fair use

exception of the Copyright Act, 17 U.S.C. § 107.  Both parties have submitted responsive briefs

to the Court's order.  Pl. Resp. (Dkt. 9); Def. Reply (Dkt. 14); Pl. Sur-Reply (Dkt. 16).

## DISCUSSION

Section 106 of the Copyright Act grants copyright holders certain exclusive rights over

their original works, including the right "to reproduce the copyrighted work in copies or

phonorecords" and the right "to display the copyrighted work publicly."  17 U.S.C. § 106.

---

[5]    For example, the background text explains that the "Frankenstein" guitar "was pieced together by Eddie Van Halen from modified factory seconds and mismatched odd-lot parts, then spray-painted.  It represents an effort to combine some of the most desirable elements of Gibson and Fender guitars into a single instrument that was not commercially available at the time.  Van Halen was continually striving to achieve the ultimate guitar for tone, playability, dependability, and functionality. . . . One of the most recognizable guitars of all time, it spawned legions of copies from other manufacturers and inspired generations of fans to design their own instruments."  Compl., Ex. B; Steinman Decl., Ex. E.

[6]    The Photo is now credited to Plaintiff.  *Compare* Compl., Ex. B, *with* Steinman Decl., Ex. E.

Assuming for the sake of argument that Plaintiff possesses the copyright and that the Met's copying of the Photo was unauthorized, the sole issue before the Court is whether the fair use doctrine warrants dismissal of the Complaint.

## I.      Standard of Review

Because this action is still in the pleadings stage, and because the parties' submissions are limited to the four corners of the Complaint and incorporated materials, the Court will apply the standards applicable to a Rule 12(b)(6) motion to dismiss.  To survive a motion to dismiss, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).  The Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The Court may also consider "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  *Graham v. Prince*, 265 F. Supp. 3d 366, 376 (S.D.N.Y. 2017) (quotation omitted); *see also supra* note 1.

## II.     Fair Use Analysis

The fair use doctrine is a statutory exception to copyright infringement.  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).  As codified in the

Copyright Act, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  To determine whether a particular use is fair use, courts engage in a case-by-case evaluation using four statutory factors in light of the purposes of copyright.  *Bill Graham*, 448 F.3d at 608.  The factors to be considered include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  Although a court must weigh all the factors, the first—in particular a use's "transformativeness"—is most important and "has a significant impact on the remainder of the fair use inquiry."  *Prince*, 265 F. Supp. 3d at 380.

Fair use is a "mixed question of fact and law," necessitating "an open-ended and context-sensitive inquiry."  *Id.* at 376 (quotation omitted).  For that reason, courts generally wait until the summary judgement phase to address fair use, *id.* at 377, but dismissal of a copyright infringement claim is warranted where fair use is clearly established on the face of the complaint, *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016).  In this case, Plaintiff does not object to addressing fair use at this stage of the proceedings.[7]  Even if he did, cases in which transformativeness can be determined by doing a side-by-side comparison of the original

---

[7]     Plaintiff acknowledges that "[a] court 'may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work.'"  Pl. Resp. at 2 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)).

work and the secondary use are particularly appropriate for disposition on a Rule 12(b)(6) motion.[8] *Prince*, 265 F. Supp. 3d at 377 (describing transformativeness as whether "the allegedly offending use of the original work" alters the first work "with new expression, meaning, or message").

### A.    Purpose and Character of the Use

The heart of the fair use inquiry is the purpose and character of the use. *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).  It includes two considerations: the transformative nature of the work, *see Bill Graham*, 448 F.3d at 608; and whether the "use is of a commercial nature or is for nonprofit educational purposes," 17 U.S.C. § 107(1).  "The more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 569 (1994).

### 1.    Transformative Use

The fair use doctrine "allows for transformative works that further the public discourse and the free exchange of ideas in order to promote science and the arts." *Baraban v. Time Warner, Inc.*, No. 99-CV-1569, 2000 WL 358375, at *2 (S.D.N.Y. Apr. 6, 2000).  To determine whether the secondary use is transformative, the "question is whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Bill Graham*, 448 F.3d at 608 (quotation omitted); *see Authors Guild v. Google, Inc.*, 804 F.3d 202,

---

[8]      *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he only two pieces of evidence needed to decide the question of fair use [at this early stage of the proceedings] are the original version of WWITB and the episode at issue."); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 86 (2d Cir. 2014) (affirming the district court's pre-discovery fair use ruling, noting that the "discovery [plaintiff] seeks would not alter our analysis"); *Lombardo v. Dr. Seuss Enters.*, 279 F. Supp. 3d 497, 505 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir. 2018) ("[A]lthough discovery might yield additional information about plaintiffs' intent, such information is unnecessary to resolve the fair use issue [on a Rule 12(c) motion]; all that is needed is the parties' pleadings, copies of *Grinch* and the Play, and the relevant case law.").

214 (2d Cir. 2015) ("[A] transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge.").  A secondary use "can be transformative in function or purpose [even] without altering or actually adding to the original work."  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (quotation omitted).  Moreover, "courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." *Bill Graham*, 448 F.3d at 609 (citing 17 U.S.C. § 107).

The Second Circuit's decision in *Bill Graham* all but decides this case.  The defendant in that case published a coffee table book about the Grateful Dead that contained unlicensed images of concert posters as part of a timeline of the band's history.  *Id.* at 607.  The timeline runs continuously throughout the book, chronologically combining approximately 2000 images representing the band's history with explanatory text; among the images were seven copyrighted concert posters displayed in reduced form with captions describing the concerts that were associated with the posters.  *Id.*

The Second Circuit held that inclusion of these posters for an historical purpose constituted fair use.  *Id.*  The Court first emphasized that the defendant's "purpose in using the copyrighted images at issue in its biography of the Grateful Dead is plainly different from the original purpose for which they were created," because the posters "fulfilled the dual purposes of artistic expression and promotion," whereas the defendant used the "images as historical artifacts to document and represent the actual occurrence of the Grateful Dead concert events."  *Id.* at 609.  The Court next considered how the images were used for scholarship, noting that no "less a

recognition of biographical value is warranted in this case simply because the subject made a mark in pop culture rather than some other area of human endeavor." *Id.* Finally, the Court found that the matter in which the images were displayed in the book strengthened the transformative nature of the use. *Id.* at 611. The book reproduced the posters in a reduced size, in combination with textual material and graphical artwork, and the posters represented an "inconsequential portion" of the book. *Id.*

The Met's use of the Photo is analogous on all three dimensions. First, Plaintiff and the Met used the Photo for entirely different purposes. Plaintiff asserts that he created the Photo to show "what *Van Halen* looks like in Performance" and that "the original meaning" behind the Photo was to "convey the message that *Van Halen* is a groundbreaking and unorthodox musician." Pl. Resp. at 5 (emphasis added). In contrast, the Met spotlights the *"Frankenstein" guitar*—using the Photo to reference and contextualize the exhibition object, which Van Halen pieced together himself "to achieve the ultimate guitar for tone, playability, dependability, and functionality." Compl., Ex. B; Steinman Decl., Ex. E. Just as the defendant in *Bill Graham* used the concert poster "as a recognizable representation of the [Grateful Dead] concert," 448 F.3d at 610 n.4, the Met used Plaintiff's Photo as an historical artifact and a "recognizable representation" of the "Frankenstein" guitar in action, Compl., Ex. B; Steinman Decl., Ex. E.[9]

Second, the Met used Plaintiff's Photo in a scholarly context. Considering that the "instruments used in rock and roll had a profound impact on this art form that forever changed music," the "Frankenstein" guitar is historically significant within the world of hard rock music.

---

[9]     The purpose of the Met's use was arguably more different in its secondary use than the *Bill Graham* defendant's. In *Bill Graham*, both the original concert posters and the reproduced versions in the book conveyed information about the band's concert—the primary difference being that the former conveyed information about the band's *forthcoming* concert, while the latter documented and represented the actual occurrence of the band's *past* concert. *See* 448 F.3d at 609. In the instant case, the Photo and the Met's secondary use communicate fundamentally different messages: while the Photo originally showcased Van Halen, Pl. Resp. at 5, the secondary use shifts that focus to the "Frankenstein" guitar to visually contextualize *its* significance.

Steinman Decl., Ex. B.  As with images in biographical books, museum exhibitions often incorporate other source material for "optimum treatment of their subjects."  *Bill Graham*, 448 F.3d at 609.  Plaintiff's Photo is displayed on the biographical page for the exhibition object—the very instrument depicted in the Photo—in order to "document and represent the [use of the guitar]," *id.* at 610, that "spawned legions of copies . . . and inspired generations of fans to design their own instruments," Compl., Ex. B; Steinman Decl., Ex. E.

Plaintiff argues that the Met's use is not transformative because the exhibition does not critique the artistic merits of the Photo itself but "merely use[s] [it] as an illustrative aid to depict the subjects featured" in the Photo.  Pl. Resp. at 3–4 (quotation omitted).  His argument misunderstands the nature of the inquiry.  What is relevant is not whether the exhibition comments on the Photo *per se*, such as the photographer's choice of lighting or focus, but whether it uses the Photo to help illustrate the historical and artistic significance of the guitar—a separate and distinct purpose from the Photo's original expressive purpose.  In *Bill Graham*, the Second Circuit directly rejected the idea that the secondary use was required to comment on the artistic value of the work when it found that "enhancing [] biographical information" was a sufficient transformative purpose.  448 F.3d at 610–11.

Third, the Photo constitutes an "inconsequential portion" of the Met's online catalogue. Plaintiff's Photo is a single image surrounded by pages of navigable textual, visual, and audio content.  Steinman Decl., Exs. B, C, and D.  The Photo is located several page-clicks within the actual catalogue of 185 object pages.  Steinman Decl., Ex. D.  And even on the "Frankenstein" guitar's page—the primary focus of which is historical and descriptive text and photographs of the guitar—the Photo is almost an afterthought.  Compl., Ex. B; Steinman Decl., Ex. E.  In short, the online catalogue's layout is designed to enrich and elaborate the *guitar's* historical

significance, primarily utilizing other photographs and text to do so. *See Bill Graham*, 448 F.3d

at 611 (finding further support for fair use where the defendant "minimized the expressive value

of the reproduced images by combining them with a prominent timeline, textual material, and

original graphical artwork" and where "the images appear on only seven pages" of the 480-page

book).

### 2.       Commercial Nature

In evaluating the purpose and character of the use, the Court must also consider "whether

such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

"The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user

makes unauthorized use of copyrighted material to capture significant revenues as a direct

consequence of copying the original work." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913,

922 (2d Cir. 1994). But "because 'nearly all' fair uses of copyrighted works are conducted for

profit, the Second Circuit has cautioned that 'the more transformative the new work, the less will

be the significance' of the commercial sub-factor." *Prince*, 265 F. Supp. 3d at 382 (alteration

omitted) (quoting *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013)).

Plaintiff argues that because the Met charges a general admission fee to out-of-town

visitors to the museum, it is a commercial enterprise and therefore the use at issue is commercial,

notwithstanding the Met's status as a nonprofit organization.[10] Pl. Sur-Reply at 2–3; *see* Def.

Reply at 11. While discovery might be helpful in providing additional information about the

Met's revenue structure or how profitable this particular exhibition was, the relevant issue is not

---

[10]       Plaintiff asserts that "there can be no dispute that Defendant charges patrons admission to view Plaintiff's
photograph on Fifth Avenue." Pl. Resp. at 5. As noted in the main text, Defendant's business model is not the
critical issue given the transformative use, but it is worth noting that the only use complained of in the Complaint is
the Met's use of the Photo in the online catalogue of the exhibition, *see supra* note 3; there is no charge for viewing
the online catalogue. Thus, despite Plaintiff's rant in his sur-reply ("Plaintiff is entitled to discovery on the issue of
how many people paid to see Plaintiff's work . . . ."), Pl. Sur-Reply at 3, no one paid anything to see the use of the
Photo complained of in the Complaint.

the Met's business model but whether the use at issue is commercial in nature.  Even in the unlikely event that discovery would reveal that Plaintiff's Photo drove viewers to visit the Met's galleries and pay admission fees, the Court would not place much significance on that fact due to the transformative nature of the secondary use.

In short, the first factor strongly favors a finding of fair use.

**B.  Nature of the Copyrighted Work**

The second fair use factor considers "(1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."  *Cariou*, 714 F.3d at 709–10 (quotation omitted).

The Photo is indisputably creative and published.  *See Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) ("[P]hotographic images of actual people, places and events may be as creative and deserving of protection as purely fanciful creations.").  While ordinarily the creative nature of the Photo would weigh in favor of the copyright holder, the second factor has limited weight in this analysis because the transformative purpose of the Met's use "was to emphasize the [Photo's] historical rather than creative value." *Bill Graham*, 448 F.3d at 612–13; *see Blanch*, 467 F.3d at 257 ("[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." (quotation omitted)); *see also Authors Guild*, 804 F.3d at 220 ("The second factor has rarely played a significant role in the determination of a fair use dispute.").

The second fair use factor weighs minimally, if at all, against a finding of fair use.

### C.    Amount and Substantiality of the Portion Used

The third fair use factor asks whether "the quantity and value of the materials used[] are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (quotation omitted).  Although the Second Circuit has never "ruled that the copying of an entire work *favors* fair use," "such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham*, 448 F.3d at 613.  Thus, "the third-factor inquiry must take into account that 'the extent of permissible copying varies with the purpose and character of the use.'" *Id.* (quoting *Campbell*, 510 U.S. at 586–87).

While the Photo is displayed in its entirely, such use is reasonable in light of the purpose and character of the use.  The Met uses the Photo as an historical artifact providing visual context for the exhibition object and the accompanying factual information about the object.  Compl., Ex. B; Steinman Decl., Ex. E.  In order to achieve this purpose, it is reasonable that the Met included the full picture of Van Halen playing the "Frankenstein" guitar. *Cf. Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003) ("If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the visual search engine."). Moreover, the Met reduced the size of the Photo and mixed it with text and other photographs, limiting the visual impact of the Photo's artistic expression. *See Bill Graham*, 448 F.3d at 613 ("We conclude that such use by [the defendant] is tailored to further its transformative purpose because [defendant's] reduced size reproductions of [the plaintiff's] images in their entirety displayed the minimal image size and quality necessary to ensure the reader's recognition of the images as historical artifacts of Grateful Dead concert events.").

In this case, the secondary use was limited and focused on the historical nature of the Photo; the third factor thus does not weigh against a finding of fair use.

### D. Effect of the Use Upon the Market for or Value of the Original

The final fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  This analysis is concerned with "whether the secondary use *usurps* the market of the original work."  *Blanch*, 467 F.3d at 258 (emphasis added) (quotation omitted).  It "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."  *Authors Guild*, 804 F.3d at 223.  As with the other factors, "this factor is also influenced by the resolution of the transformativeness inquiry" because "the more transformative the secondary use, the less likelihood that the secondary use substitutes for the original."  *Prince*, 265 F. Supp. 3d at 384 (quotation omitted).

The Second Circuit has made clear that a "transformative market" does not qualify as a "traditional market."  *See Bill Graham*, 448 F.3d at 615 (holding that because the defendant's use of the copyrighted images as historical artifacts "falls within a transformative market, [the plaintiff] does not suffer market harm due to the loss of license fees").  And with respect to the "traditional market," a court must "look at the impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets," not, simply, that the defendant failed to pay a licensing fee.  *Id.* at 614 (quotation omitted).

Plaintiff argues that museums are a potential market for his work because they are shifting towards more modern, pop-culture centered exhibits.  Pl. Sur-Reply at 6–7.  He requests discovery to establish whether that market is "likely to be [a] developed market."  *Id.* at 7.  But

Plaintiff "cannot prevent others from entering fair use markets merely by developing or licensing a market [for] transformative uses of [his] own creative work." *Bill Graham*, 448 F.3d at 615 (quotation omitted).  A traditional market for the Photo would be collectors of photographs of rock legends or other persons seeking to showcase Van Halen.  Being generous, that market might even extend to museums exhibiting musicians.  But the Met's use of the Photo to visualize the "Frankenstein" guitar as *played* by Van Halen falls into a different, transformative market.  It is thus unlikely that markets for the Photo's original expressive purpose would be affected in any way.  In any event, Plaintiff has offered only conclusory assertions that the Met's use has caused "a meaningful or significant effect upon the potential market for the copyrighted work." *Authors Guild*, 804 F.3d at 224 (quotation omitted).

Accordingly, the fourth fair use factor weighs in favor of a finding of fair use.

### E.  Balance of Factors

The Court finds that the balance of the fair use factors strongly favors the Met's use.  The first and most important factor weighs heavily towards a finding of fair use and significantly colors the other three factors.  The Met's use of the Photo to present the "Frankenstein" guitar as an historical artifact is transformatively different from the original expressive purpose of the Photo.  The second factor, which might otherwise favor Plaintiff, therefore, has limited weight.  Similarly, although Plaintiff's Photo was copied in its entirety, the third factor does not weigh against fair use because the amount of the Photo used is reasonable in light of the transformative purpose for which the Photo was used.  Finally, Plaintiff's appeal to missed revenue in the "museums" market holds no sway and, in fact, favors a fair use finding.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Met's use of Plaintiff's

copyrighted Photo in its online catalogue is fair use.  Accordingly, Plaintiff's Complaint is

DISMISSED.  The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

**Date:  July 13, 2020**                    _____
**New York, New York**                          **VALERIE CAPRONI**
                                         **United States District Judge**